UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
BRIAN McNAMARA,

                            Plaintiff,                       **<u>MEMORANDUM AND ORDER</u>**
                                                        2:16-cv-01205 (DRH)(SIL)

     - against -

THE CITY OF LONG BEACH, THE LONG
BEACH VOLUNTEER FIRE
DEPARTMENT (LBVFD), SCOTT
KEMINS, in his individual and official
capacity, and JACK SCHNIRMAN, in his
individual and official capacity,

                            Defendants.
-------------------------------------------------------X

**APPEARANCES**

**RAISER & KENNIFF, P.C.**
For Plaintiff
300 Old Country Road, Suite 351
Mineola, NY 11501
By:    Jonathan Tand, Esq.

**CORPORATION COUNSEL, CITY OF LONG BEACH**
For Defendants
1 West Chester Street
Long Beach, NY 11561
By:    Megan Conger, Esq.

**HURLEY, Senior District Judge:**

### INTRODUCTION

       Plaintiff Brian McNamara brought this action against Defendants the City of Long Beach

("City"), the Long Beach Volunteer Fire Department ("LBVFD"), Scott Kemins ("Kemins"), in

his individual and official capacity, and Jack Schnirman ("Schnirman"),[1] in his individual and

---

[1] Since the filing of the complaint, Defendant Schnirman has been voluntarily dismissed from this action.  (DE 20.)

official capacity, (collectively, "Defendants") pursuant to 42 U.S.C. § 1983 for First Amendment retaliation based on his speech relating to and membership in a union.

Presently before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56.  For the reasons set forth below, that motion is granted.

## BACKGROUND

The following facts are taken mostly from Defendants' Rule 56.1 Statement, the vast majority of which Plaintiff admits as true, and are therefore undisputed unless otherwise noted.

Plaintiff was hired as a paid firefighter with the Long Beach Fire Department ("LBFD") on or about September 2005.  (Defs.' R. 56.1 Stmt. [ECF No. 44] ¶ 31.)  In January 2011, Plaintiff became the Secretary of his union, the Long Beach Professional Firefighters Association, Local 287 ("LBPFA"), which is the "union and exclusive bargaining agent representing all paid firefighters within the City."  (*Id.* ¶¶ 1, 32.)

### A.  Long Beach Firefighters

The City utilizes a "'combined department' model for its fire protection service, which consists of both paid…and volunteer units."  (*Id.* ¶ 2.)  Members of the volunteer unit supervise and command paid firefighters at emergency scenes but do not control the "key terms and conditions of paid firefighters' employment."  (*Id.* ¶ 4.)   Relations between the paid and volunteer units has "been marked by rivalry and conflict."  (*Id.* ¶ 3 (internal quotations omitted).)

### B.  Plaintiff's Speech Activities

Plaintiff maintains he advocated for the union firefighters publicly and claims that he was retaliated against in connection with that speech.  In his complaint, plaintiff identifies three of his speech-related activities inciting retaliation: 1) his responsibilities as LBPFA secretary; 2) a

website he created for the Long Beach Professional Firefighters ("LBPF"), which "aired some of

his concerns with the general structure of the LBVFD;" and 3) an article he authored about union

firefighter "saves," which appeared in Newsday.  (Compl. [ECF No. 1]; Defs.' R. 56.1 Stmt. ¶ 21

(internal quotations omitted).)  When asked at his deposition if there were particular instances

that he believed incited retaliatory behavior, he responded that "we would point out [at union

meetings that] we need more staffing because the volunteers aren't showing up to the ambulance

calls."  (Defs.' R. 56.1 Stmt. ¶ 22.)   He also stated at his deposition that the union board

advocated for more personnel whereas Schnirman, the City Manager, advocated for layoffs.  (*Id.*

¶ 23.)[2]  Nonetheless, other union board members who opposed Schnirman's opinion on staffing

were not terminated.  (*Id.* ¶ 24.)

### C.  Plaintiff's Misconduct

"[P]laintiff displayed a pattern of misconduct over the course of several years that

escalated up through and including the June 2, 2014 charges that led to his discharge, and which

form the basis of the instant action."  (*Id.* ¶ 37.)  Indeed, "Plaintiff himself admits to a history of

'conflicts' with fellow professional (union) firefighters within the [LBFD]".  (*Id.* ¶ 38.)

Defendants contend that Plaintiff began displaying signs of "insubordinate and emotionally-

unstable behavior, and had been critiqued or disciplined by his supervisors as a result" on June

---

[2] Curiously, in his Rule 56.1 Statement Response, Plaintiff disputes this statement, *i.e.*, that he
stated during his deposition that the union advocated for more personnel whereas Schnirman
advocated for layoffs, on the basis that "[t]he testimony cited does not say what Defendant
claims it does."  (Pl.'s R. 56.1 Stmt. Resp. [ECF No. 45-1] ¶ 23.)  A review of the cited
document, Plaintiff's deposition transcript, reveals that Defendants did correctly quote the
deposition testimony, although with a few minor typographical errors.  (Conger Decl. Ex. B
(Pl.'s Dep. Tr.) [ECF No. 44-3] at 327:15-328:8 ("We were advocating for more personnel, more
staffing, and he was advocating for layoffs.  We were not agreeing.")）  Defendants correctly
inferred that "he" referred to Jack Schnirman and "we" referred to the union based on the
immediately preceding and subsequent portions of the transcript.

10, 2010, (*Id.* ¶ 33), [3] and further recites that Plaintiff engaged in such behavior on August 27, 2011 and was issued formal charges and specifications on December 6, 2011. (*Id.* ¶ 34.) Additionally, in March 2013, Plaintiff was charged with off-duty misconduct "after he was arrested and charged with stalking a former co-worker," John Ritter. (*Id.* ¶ 35.)

### D. May 10, 2014 Incident

On May 10, 2014, Plaintiff attended a "Fire Department installation and awards dinner" at The Sands in Lido Beach, New York. (*Id.* ¶ 45.) Plaintiff was initially "excluded from the invitation list, due to his open contempt for the volunteer fire department, and [its] chief, in particular." (*Id.* ¶ 46.) Plaintiff was ultimately allowed to attend on the condition that he "not embarrass the department." (*Id.* ¶ 46 (internal quotations omitted).)

Plaintiff consumed five beers at the awards dinner.[4] (*Id.* ¶ 47.) After dinner, the City provided a bus to transport LBFD members back to Long Beach, including to the "all-volunteer firehouse in Long Beach known as the Indiana (a/k/a 'West End') Fire House, where an after-party was scheduled to take place." (*Id.* ¶¶ 49-50.) Plaintiff was not "explicitly invited to this after-party." (*Id.* ¶ 51.) Plaintiff attempted to board the bus in The Sands parking lot but his "access was blocked by a volunteer firefighter, ex-Chief Rick DiGiacomo ('DiGiacomo')." (*Id.*

---

[3] Plaintiff contends that "the evidence cited does not mention any emotionally unstable behavior." The cited document, the December 30, 2014 disciplinary hearing determination, refers to "McNamara's 'angry outbursts' and 'anger management issues.'" (Conger Decl. Ex. D (Disciplinary Hearing Determination) [ECF No. 44-3] at 29.)

[4] Plaintiff disputes this fact on the basis that the cited "document does not make reference to the number of beers consumed by plaintiff." (Pl.'s R. 56.1 Resp. ¶ 47.) A review of the cited document, the disciplinary hearing determination, reveals that McNamara testified at his disciplinary hearing that he consumed five Budweiser beers "[f]rom 9:00 pm until 11:30-11:45 p.m." and that he would not have wanted to drive home that night. (Conger Decl. Ex. D at 12.) This was noted at page 12 rather than page 11 as indicated in Defendants' Rule 56.1 Statement. Plaintiff was charged with intoxication while on duty or in uniform in connection with the events of May 10, 2014 but was ultimately found not guilty "due to LBFD's failure to satisfy its burden to demonstrate legal 'intoxication.'" (Defs.' R. 56.1 Stmt. ¶ 48.)

¶ 52.)  Another volunteer firefighter, Captain Jake Jacobi ("Jacobi"), told plaintiff he could not

enter the bus.  (*Id.* ¶ 53.)  A verbal altercation ensued and Jacobi pushed Plaintiff "in the chest

'but not hard.'"  (*Id.* ¶¶ 54-56.)  "[T]he feuding parties were separated" and Lieutenant

Christopher Gromley drove Plaintiff home.  (*Id.* ¶ 57.)

Once home, Plaintiff changed out of his uniform into plain clothes and placed a digital

audio recorder into his pocket.  (*Id.* ¶ 61.)  Plaintiff walked over to the Indiana Firehouse, "where

he knew or reasonably should have known where DiGiacomo and Jacobi would be located."  (*Id.*

¶ 62.)  Plaintiff took the audio recorder because of the "'friction' between himself and the

volunteers earlier in the night, and 'in case something happened, [he] didn't want to be ganged

up on and a lie be told by five separate volunteers making up the same lie….'"  (*Id.* ¶ 63 (internal

quotations omitted).)

Plaintiff entered the "Den" in the Indiana Firehouse and "immediately walked to the

location where Jacobi 'happened to be' which was at the bar."  (*Id.* ¶ 64.)  As Plaintiff confirmed

in his response to Defendants' Rule 56.1 Statement, "[o]nce inside the Indiana Firehouse a verbal

altercation (triggered by plaintiff's presence) quickly spiraled into a physical altercation, which

involved plaintiff punching Jacobi in the face."  (*Id.* ¶ 65; Pl.'s R. 56.1 Stmt. Resp. ¶ 66 ("Admit

to the altercation occurring disputed as to the cause").)[5]  Deputy Fire Chief Joseph Miller, who is

also a Nassau County Police Sergeant, witnessed the event and "attempted to prevent the verbal

altercation from escalating into a [further] physical altercation by 'grabbing' plaintiff and pulling

him towards the staircase to exit the Den."  (Defs.' R. 56.1 Stmt. ¶¶ 66-67.)  A second round of

---

[5] The numbers in Plaintiff's Rule 56.1 Statement Response do not line up with Defendants' Rule
56.1 Statement because Plaintiff appears to have inadvertently numbered his response to
paragraph 26 as paragraph 27, thereby creating an additional paragraph.

verbal and physical hostilities ensued on the stairway, during which DiGiacomo called Plaintiff a coward and Plaintiff responded "I'm not a coward!  I came here and I'm a coward?"  (*Id.* ¶ 68.)

### E.  Audio Recording of Incident

Plaintiff turned on the audio recording device he brought with him to the Indiana Firehouse immediately before entering the firehouse.  (*Id.* ¶ 73.)  After leaving the firehouse, Plaintiff had a brief conversation with Hadrick Ray, a volunteer fire fighter, outside the firehouse.  (*Id.* ¶¶ 70, 74; Conger Decl. Ex. B at 230:19-21.)  At some point after that conversation, Plaintiff turned off the recording device.  (Defs.' R. 56.1 Stmt. ¶ 74.)  Plaintiff did not inform anyone that he was recording the events that night.  (*Id.* ¶ 76.)

Though Plaintiff has not produced the entire audio recording of the incident in this action, he admits that he altered it.[6]  (*Id.* ¶¶ 78-80.)

### F.  Disciplinary Action

On May 11, 2014, Miller reported Plaintiff's actions the night before to Kemins, the Fire Commissioner.  (*Id.* ¶¶ 17, 81.)  Kemins referred the incident to Robin Lynch, the designated Workplace Security Coordinator.[7]  (*Id.* ¶ 82.)  Lynch investigated the incident and drafted a report based on her investigation, which was submitted to James LaCarrubba, Director of Labor

---

[6] Defendants contend that Plaintiff has not produced the "entire (un-altered) audio recording of the incident, despite a court order from Magistrate Judge Brown to do so;" Plaintiff contends that he no longer has the recording.  (Pl.'s R. 56.1 Stmt. ¶¶ 80-81.)

[7] Plaintiff disputes this fact on the basis that "The document does not indicate who it was reported to or who it was referred to."  The document is largely illegible and appears to be missing pages.  Nonetheless, this fact is not material in that it does not affect the outcome of the present motion and is included merely to demonstrate the sequence of events as referred to by Defendants.

Relations.[8]  (*Id.* ¶¶ 82-83.)  Plaintiff did not inform Lynch that he was in possession of an audio recording of the incident.  (*Id.* ¶ 77.)

Pursuant to the terms of the collective bargaining agreement between the City and the LBPFA ("CBA"), "there are two general categories of discipline (with separate procedures) that the City may pursue against an employee: (1) command discipline; and (2) charges and specifications."  (*Id.* ¶¶ 1, 7, 8.)  If the City pursues charges and specifications, the City Manager[9] conducts a hearing and determines whether the employee is guilty, and if so, what the appropriate penalty should be.  (*Id.* ¶ 9.)

On June 2, 2014, Kemins served Plaintiff with a charge of misconduct for "unreasonably escalat[ing] a verbal dispute…and…physically str[iking] [another member of the Fire Department] in the face", with five specifications, including that Plaintiff violated the Work Place Violence Protection Act ("WVPA").  (*Id.* ¶¶ 39, 84; Conger Decl. Ex. F (Disciplinary Charges & Notice of Suspension Without Pay) [ECF No. 44-3].)  Plaintiff previously denied using physical violence but admitted to "verbally abusing his coworker(s) during the incident." (*Id.* ¶ 86.)  As noted above, Plaintiff has now admitted to being physically violent as well with respect to the incident with Jacobi.  (*Id.* ¶ 65; Pl.'s R. 56.1 Stmt. Resp. ¶ 66.)

Kemins served Plaintiff with additional charges and specifications over the summer of 2014 in connection with the audio recording he took at the firehouse after the awards dinner on May 10, 2014.  On July 9, 2014, Kemins served Plaintiff with charges and specifications for

---

[8] Plaintiff disputes this fact on the basis that "The document does not indicate who it was reported to or who it was referred to."  The cited document, a memorandum from Lynch to LaCarrubba, indicates that Lynch conducted an investigation and submitted a report to LaCarrubba.  (Conger Decl., Ex. J (Lynch Memorandum) [ECF No. 44-3].)
[9] The City Manager is akin to a town mayor and "largely controls the key terms and conditions of paid firefighters' employment."  (Defs.' R. 56.1 Stmt. ¶ 6.)

ignoring an order to inform Kemins whether Plaintiff was "in possession of certain audio and/or visual recordings of the May 10-11, 2014 incident." (*Id.* ¶ 42.)  On August 7, 2014, Kemins served Plaintiff with additional charges and specifications for "failing to disclose the same audio and/or video recording by July 11, 2014," as he had previously been ordered to do.  (*Id.* ¶ 43.)

As a result of the June 2, 2014 charges and specifications, Plaintiff became the subject of a disciplinary proceeding that resulted in his termination.  (*Id.* ¶ 96.)  As per the terms of the CBA, former-Defendant Schnirman, the City Manager, presided over the proceeding, which "was held over the course of days". [10]  (*Id.* ¶¶ 10, 95.)  Plaintiff had the opportunity to present witnesses and evidence on his behalf during the proceeding, which opportunity he availed himself of.  (*Id.* ¶ 95.)

On December 30, 2014, Schnirman found Plaintiff guilty of three of the five specifications and terminated him from his position as a firefighter.  (*Id.* ¶ 11; Conger Decl. Ex. D.)  In making his determination, Schnirman adopted Lynch's "methodology,"[11] which relied on a disciplinary determination issued in a separate case by Labor Arbitrator Robert Douglas.  (*Id.* ¶

---

[10] The CBA provides that, if the City Manager does not conduct a hearing, the parties may proceed by AAA arbitration.  (Defs.' R. 56.1 Stmt. ¶ 9.)  Following the commencement of the disciplinary hearing, Plaintiff and his union filed a Demand for Arbitration with the AAA. (*Id.* ¶ 12.)  The City moved to stay the arbitration and Plaintiff cross-moved to compel arbitration and for a finding that the City abused its discretion in appointing Schnirman as the hearing officer because of Schnirman's alleged bias against Plaintiff.  (*Id.*; *City of Long Beach v. Long Beach Prof'l Firefighters Ass'n, Local 287*, 45 Misc. 3d 664, 993 N.Y.S.2d 470 (Sup. Ct. 2014).)  The Supreme Court, Nassau County, in deciding to stay the arbitration to allow the hearing to continue, stated, *inter alia*: "[U]pon a review of the record of the proceeding the Court finds that the allegations of bias on the part of Schnirman are based on little more than surmise and conjecture; they ultimately are founded on no more than what he did in his role as City Manager, and do not amount to the showings of actual bias or the appearance of bias on his part that would serve as a basis for disqualifying him, even if he were serving as a neutral arbitrator."  (Defs.' R. 56.1 Stmt. ¶ 13 (quoting *City of Long Beach v. Long Beach Prof'l Firefighters Ass'n, Local 287*, 45 Misc. 3d 664, 669, 993 N.Y.S.2d 470 (Sup. Ct. 2014)).)

[11] The Court understands Defendants' use of the word "methodology" in this context to mean something akin to "reasoning" or "analysis".

88.)   In the case before Douglas, a paid fire lieutenant, Jay Gusler, was demoted for unnecessarily escalating a dispute after having been provoked.  (*Id.* ¶ 89.)  Lynch testified that "it was only logical that [McNamara] be discharged for his escalation of a dispute that turned physical" in light of the decision in the Gusler case, as well as "plaintiff's disciplinary history and the City's corresponding attempts at progressive discipline."  (*Id.* ¶¶ 92-93.)  "[T]he factor which most heavily influenced Schnirman's determination was his duty to account for all safety and liability risks, coupled with his well-supported belief that plaintiff's misconduct would repeat itself, in light of his past disciplinary history."  (*Id.* ¶ 94.)

## DISCUSSION

### I.   Legal Standard for Summary Judgment

Summary judgment pursuant to Rule 56 is appropriate only where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law.  *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994).  The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor.  *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that

show that there is a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (*quoting Anderson*, 477 U.S. at 252) (internal quotation marks omitted), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)) (internal quotation marks omitted), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court considering a summary judgment motion must also be "mindful . . . of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the "evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). "[W]here the nonmovant will bear the ultimate burden of proof at trial on an issue, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that his claim is not 'implausible.'" *Id.* at 211 (citing *Matsushita*, 475 U.S. at 587).

## II.   Plaintiff's Claims

Plaintiff asserts two causes of action against Defendants, both pursuant to 42 U.S.C. § 1983 for First Amendment Retaliation. The first count is based on Plaintiff "speaking out on

issues of public concern in the course of his duties as a citizen and as an officer of a labor union," while the second count is based on Plaintiff's free assembly as part of a labor union. (Compl. [ECF No. 1] ¶¶ 47-48.)  Plaintiff seeks compensatory, emotional, and psychological damages; injunctive relief; and attorney's fees.  (*Id.* ¶ 49.)

## III.    The Motion for Summary Judgment is Granted

### A.  Long Beach Volunteer Fire Department

Defendants argue that the LBVFD lacks the capacity to be sued because it is merely an administrative arm of the City of Long Beach.  (Defs.' Mem. in Supp. [ECF No. 44-5] at 3.) Plaintiff, in effect, concedes that point by failing to raise any arguments in opposition. Accordingly, the LBVFD is dismissed from this action.  *See Jackson v. County of Nassau*, 2010 WL 335581, at *5 (E.D.N.Y. Jan. 22, 2010) (an administrative arm of a municipality lacks the capacity to be sued); *Nickey v. Coward*, 2016 WL 324959, at *3 (E.D.N.Y. Jan. 26, 2016), *aff'd sub nom. Nickey v. Carboine*, 682 F. App'x 78 (2d Cir. 2017) (arguments not made in opposition to summary judgment motion deemed abandoned).

### B.  First Amendment Claims

The First Amendment of the United States Constitution states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or of the right of the people peaceably to assemble, and to petition the government for a redress of grievances."  U.S. Const. Amend. 1.

 To state a claim for First Amendment retaliation, a plaintiff must establish that "(1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech."  *Cox v. Warwick Valley Cent. School Dist.*, 654 F.3d 267, 272 (2d Cir. 2011).

"When public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006).  However, there are times when a public employee's speech falls within the ambit of the First Amendment.  To determine whether a public employee's speech is protected, courts conduct a two-step inquiry.  *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015).

First, the court "determin[es] whether the employee spoke as a citizen on a matter of public concern.  *Id.* (quoting *Garcetti*, 547 U.S. at 418).  "This step one inquiry in turn encompasses two separate subquestions: '(1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke 'as a citizen' rather than solely as an employee.'"  *Id.* (quoting *Jackler v. Byrne*, 658 F.3d 225, 235 (2d Cir. 2011)). An employee speaks as a citizen if the speech fell outside of the employee's official responsibilities, and a civilian analogue existed.  *Id.* at 173 (citing *Weintraub v. Bd. of Educ.*, 593 F.3d 196, 203–04 (2d Cir. 2010)).  Speech is on a matter of public concern and therefore a protected activity "if it relates 'to any matter of political, social, or other concern to the community.'" *Dillon v. Suffolk Cnty Dept. of Health Servs.*, 917 F. Supp. 2d 196, 205 (E.D.N.Y. 2013) (citing *Connick v. Myers*, 461 U.S. 138, 146, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983)).  If the answer to either subpart is no, the inquiry ends.  "If, however, both questions are answered in the affirmative, the court then proceeds to the second step of the inquiry, commonly referred to as the *Pickering* analysis: whether the relevant government entity 'had an adequate justification for treating the employee differently from any other member of the public based on the government's needs as an

employer.'" *Matthews,* 779 F.3d 167 (quoting *Lane v. Franks*, 573 U.S. 228, 134 S. Ct. 2369,

2380, 189 L. Ed. 2d 312 (2014)).

> a. *Allegedly Protected Speech*

The Court must first identify the nature of the allegedly protected speech.  Defendants

have surmised that Plaintiff "has essentially articulated two claims regarding alleged protected

speech….First, plaintiff claims, very generally that his 'pro-union' opinions incited retaliation.

Specifically, plaintiff claims that his writing was taken from the union website and used in a

Newsday article about union firefighter 'saves,' which caused defendants to retaliate against him.

Second, plaintiff claims that he espoused the opinion at union meetings that union firefighters

were understaffed, which also caused defendants to retaliate against him."  (Defs.' Mem. in

Supp. at 5.)  Plaintiff does not offer a clear articulation of his claims and does not dispute

Defendants' characterization of his allegedly protected speech.

Defendants contend that the speech at issue was made "pursuant to [P]laintiff's official

duties as a professional firefighter and union member."  (Defs.' Mem. in Supp. at 8.)  Plaintiff's

argument as to why his speech was protected is difficult to discern because, *inter alia*, he merely

cites to case law without connection to the facts at hand.  For example, Plaintiff quotes the

following language from *Connick v. Meyers*: "Whether an employee's speech addresses a matter

of public concern must be determined by the content, form and context of a given statement, as

revealed by the record as a whole."  (Pl.'s Mem. in Opp. [ECF No. 45] at 7 (citing *Connick v.

Meyers*, 461 U.S. 138, 147-148 (1983)).)  Yet the record does not provide any specific

information on the content, form, or context of Plaintiff's statements beyond brief conclusory

characterizations, such as the one provided by Defendants.  There is no information before the

Court as to the specific statements Plaintiff made or the date on which he made them, let alone

any discussion of what Plaintiff's job responsibilities were such that the Court could determine whether Plaintiff's statements were made pursuant to his official duties. Indeed, Defendants note that the Newsday article Plaintiff thought he was retaliated in response to "was never identified by title and/or date, nor was it produced to defendants during discovery." (Defs.' Mem. in Supp. at 10.)

Thus, given the lack of clarity surrounding these issues, the Court is unable to determine whether Plaintiff engaged in protected speech. Nonetheless, given that the Court should "draw[] all inferences and resolv[e] all ambiguities in favor of the non-movant," the Court continues to the next step of the First Amendment analysis on the assumption that Plaintiff did engage in protected speech, *Chertkova*, 92 F.3d at 86, after discussing the second predicate for his First Amendment retaliation claims.

> b. *Alleged Freedom of Association* viz a viz *Union Membership*

Plaintiff also asserts a First Amendment retaliation claim based on his membership in a union. "[A] public employee bringing a First Amendment freedom of association claim must persuade a court that the associational conduct at issue touches on a matter of public concern." *Cobb v. Pozzi*, 363 F.3d 89, 102 (2d Cir. 2004).

As with the protected speech claim, the record is lacking with respect to the freedom of association claim. Nonetheless, given that "[s]ome district courts in the Second Circuit have found that union membership is per se a matter of public concern," even though "not all union-related activity raises a matter of public concern," *Payson v. Bd. of Educ. of Mount Pleasant Cottage Sch., USFD*, 2017 WL 4221455, *16 (S.D.N.Y. Sept. 20, 2017) (collecting cases)*, the Court will proceed through the analysis assuming that Plaintiff's union membership touched on a matter of public concern and that he therefore engaged in a protected activity.

c.   *Adverse Employment Actions*

Proceeding on the assumption that Plaintiff's union membership or related speech is protected by the First Amendment, the next step in the analysis is to determine whether Plaintiff suffered an adverse employment action.  *Cox*, 654 F.3d at 272.  Here, there appears to be no dispute that Plaintiff suffered adverse employment actions. [12]  In particular, Kemins served charges and specifications on Plaintiff and Schnirman subsequently terminated Plaintiff.  (Defs.' Mem. in Supp. at 8.)[13]  Thus, the Court focuses its analysis on whether there was a causal connection between Plaintiff's First Amendment claims and these adverse employment actions.

d.   *Causation*

"To establish causation, a plaintiff must show that the protected speech 'was a substantial motivating factor in the adverse employment action.'"  *Pitton v. New York City Dep't of Educ.*, 148 F. Supp. 3d 217, 229-30 (E.D.N.Y. 2015) (quoting *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Ed.*, 444 F.3d 158, 167 (2d Cir. 2006)).  The same is true with respect to the freedom of association claim.  *Cobb*, 363 F.3d at 102.  Causation may be established "either directly through a showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by the adverse action."  *Smith v. County of Suffolk*, 776 F.3d 114, 118-119 (2d Cir. 2015) (citing *Cobb*, 363 F.3d at 108).  A direct showing of retaliatory animus requires tangible proof rather than conclusory assertions of retaliatory animus.  *Id.*   Plaintiff "bears the

---

[12] Defendants contend that this includes the June 2, 2015, July 9, 2014, and August 7, 2014 charges and specifications. (Defs.' Mem. in Supp. at 9 n.2.) The Court assumes that by June 2, 2015, Defendants mean the June 2, 2014 charges and specifications that ultimately led to Plaintiff's termination.

[13] Although Plaintiff states that "Defendants assert that Plaintiff has failed to show an adverse employment action," the Court does not see such an assertion in Defendants' papers.  (Pl.'s Opp. at 9.)  Indeed, Defendants point to the charges and specifications against Plaintiff, as well as his subsequent termination, as examples of adverse employment actions.

'initial burden of showing that an improper motive played a substantial part in defendant's action.'"  *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 114 (2d Cir. 2011) (quoting *Scott v. Coughlin*, 344 F.3d 282, 288 (2d Cir. 2003)).  "[E]ven if there is evidence that the adverse employment action was motivated in part by protected speech [or freedom of association], the government can avoid liability if it can show that it would have taken the same adverse action in the absence of the protected [activity]."  *Anemone*, 629 F.3d at 114 (citing *Mt. Healthy City School Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274, 287, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977)).

Here, Plaintiff has failed to meet his burden of showing the existence of a material fact suggesting that his termination was tethered in some substantial measure to either his union membership or otherwise to protected speech.  He offers no tangible proof of retaliatory animus, and barely anything by way of conclusory assertions.  As Defendants note, "[a]ll plaintiff offers is his own conjecture that he was generally disliked by the volunteer firefighters – not even defendant Kemins specifically – because of his 'pro-union' opinions."  (Defs.' Mem. in Sup. at 10.)  And, "there is nothing in the record to suggest that defendant Kemins even knew about the opinions plaintiff espoused at union meetings regarding union firefighter staffing."  (Defs.' Mem. in Supp. at 10.)  Furthermore, Plaintiff admits that other union board members who shared his views on staffing were not terminated.

With respect to a possible temporal connection to indirectly show causation, Plaintiff has not said that the adverse employment actions were taken shortly after he engaged in allegedly protected activity.  Furthermore, the Court is unable to draw any conclusions on this point given the lack of detail surrounding the allegedly protected speech, including the dates on which such speech was allegedly made.  What is clear, however, is that the disciplinary charges were brought within weeks of Plaintiff's objectively inappropriate behavior on May 10, 2014, the

night of the installation awards dinner when he engaged in verbally and physically abusive behavior towards his colleagues.  Similarly, the decision to terminate Plaintiff came after a thorough hearing at which Plaintiff was afforded the opportunity to present evidence. Accordingly, the Court finds that the record is devoid of facts that would permit the conclusion that there is a causal connection between the allegedly protected speech or association and the adverse employment actions.

Even if Plaintiff had established a causal connection between his allegedly protected activities and the adverse employment actions he suffered, Defendants have shown that they had an independent basis for taking such actions, *i.e.*, Plaintiff's inappropriate behavior. Furthermore, "[w]here an employee's termination occurs 'after a decision, based on substantial evidence of an undisputedly independent, neutral, and unbiased adjudicator that had the power to prevent termination,' that fact is 'highly probative of the absence of [retaliatory] intent in that termination.'"  *Mohammed v. New York City Dep't of Educ.*, 932 F. Supp. 2d 420, 430 (E.D.N.Y. 2013) (quoting *Collins v. New York City Transit Auth.*, 305 F.3d 113, 119 (2d Cir. 2002)).  As noted above, Plaintiff was terminated after a multi-day hearing at which he had the opportunity to present evidence.  Plaintiff has not shown any reason to question the determination of the disciplinary proceedings, and indeed his attempts to disqualify Schnirman as a neutral arbiter were rejected in a state court proceeding as unfounded.  *See supra*, 7-8, n.9.

There is no dispute that Plaintiff had a pattern of misconduct separate from his allegedly protected speech or union membership, which served as a substantial motivating factor for his termination.  Though his misconduct dates back to June 2010, most relevant to this action is Plaintiff's behavior at and following the installation and awards dinner on May 10, 2014, which included repeated verbal and physical altercations over the course of the night.  Plaintiff admitted

to having five beers at the dinner and not being comfortable driving home that night.  After an initial altercation with volunteer firefighters on the bus after the dinner, Plaintiff went home. Instead of staying home and ending the altercation, Plaintiff picked up an audio recorder and went to the firehouse, where further altercations ensued, including the previously mentioned incident with Jacobi.  Such behavior is unbecoming in any profession, and it is not surprising that Defendants would react adversely to it.  Thus, for the foregoing reasons, Plaintiff has failed to show a material issue of fact as to a causal relationship between his allegedly protected speech or union membership and his termination.

Moreover, the Court is satisfied that there are no genuine disputes of material fact with respect to the First Amendment retaliation claims given that Plaintiff admitted the vast majority of the facts in Defendants' Rule 56.1 Statement and did not present any significant facts of his own.  Indeed, Plaintiff's complete lack of citation to any fact in his favor is reason alone to grant summary judgment in favor of Defendants.  *See Gallo v. Prudential Residential Serv.*, 22 F.3d 1219, 1224 (2d Cir. 1994) ("When no rational jury could find in favor of the nonmoving party because the evidence in support of its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper."); *Senno v. Elmsford Union Free Sch. Dist*, 812 F. Supp. 2d 454, 467-68 (S.D.N.Y. 2011) ("[T]he non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor.") (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986)).  Accordingly, Plaintiff has failed to put forth evidence to permit a reasonable trier of fact to find in his favor on his First Amendment retaliation claims and Defendants are therefore entitled to judgment as a matter of law.

### C.  *Immunity for Defendant Kemins*

Because the Court finds that Plaintiff has not made out a claim for First Amendment retaliation, the Court need not consider whether Defendant Kemins is entitled to absolute or qualified immunity.

### D.  *Municipal Liability*

The claim against the City of Long Beach is also dismissed because Plaintiff has not made out a claim for First Amendment retaliation.  *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (there is no municipal liability where a plaintiff cannot show that a city actor violated his constitutional rights)

### E.  *Plaintiff's Additional Claims*

Plaintiff discusses claims in his opposition brief that were not raised in the complaint. For example, Plaintiff references state law claims on the first page of his brief, however the complaint does not allege any state causes of action.  (Pl.'s Opp. at 1 ("Defendants now move for summary judgment…as to Plaintiff's First Amendment claims (and related claims under the New York State Constitution)."))  Additionally, Plaintiff argues that there is a question of material fact as to his claim for deprivation of his First Amendment right to petition the Government.  (Pl.'s Opp. at 13.)  Because these claims did not appear in the Complaint, and because Plaintiff did not move to amend his complaint, they are inappropriate at this stage of the litigation.  Accordingly, they are dismissed.

**CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is granted.  The

Clerk of Court is directed to enter judgment and close this case.

**SO ORDERED.**

Dated:  Central Islip, New York
       July 10, 2020

                                  s/ Denis R. Hurley
                                  Denis R. Hurley
                                  Unites States District Judge